**In re DATA GENERAL CORPORATION ANTITRUST LITIGATION.**

**M.D.L. No. 369 WHO.**

United States District Court, N. D. California.

March 7, 1980.

1094

Miller, Starr & Regalia, Jack C. Provine, M. Janice Smith, Oakland, Cal., for plaintiff Digidyne Corp.

Powell, Goldstein, Frazer & Murphy, David R. Aufdenspring, R. Carl Cannon, Atlanta, Ga., Steinhart, Goldberg, Feigenbaum & Ladar, James T. Fousekis, Rocky N. Unruh, San Francisco, Cal., for plaintiff SCI Systems, Inc.

Pillsbury, Madison & Sutro, John B. Bates, John A. Sutro, Jr., Andrew J. Ogilvie, San Francisco, Cal., Brown & Bain, P.A., Jack E. Brown, Paul F. Eckstein, Eugene D. Cohen, Jennifer B. Beaver, Phoenix, Ariz., Bernard Petrie, San Francisco, Cal., for plaintiff Fairchild Camera and Instrument Corp.

Ballard, Wimer, Baker & Brockett, Warren B. Wimer, Fullerton, Cal., for plaintiff Bytronix Corp.

Mark F. Anderson, San Francisco, Cal., for plaintiff Data Compass Corp.

McCutchen, Doyle, Brown & Emersen, John N. Hauser, Lynn H. Pasahow, William Bates, III, Stanton R. Koppel, Andrew J. Wistrich, San Francisco, Cal., Paul, Weiss, Rifkind, Wharton & Garrison, Jay Greenfield, Colleen McMahon, Anne Louise Oates, New York City, for plaintiff Ampex Corp.

Heller, Ehrman, White & McAuliffe, Weyman I. Lundquist, Richard L. Goff,

Douglas M. Schwab, San Francisco, Cal., Thelen, Marrin, Johnson & Bridges, Max Thelen, Jr., Frank D. MacDowell, Robert B. Pringle, San Francisco, Cal., Ream, Train, Horning, Maxwell, Ellison & Roskoph, David H. Ellison, Richard A. Horning, Palo Alto, Cal., Reavis & McGrath, Stephen R. Steinberg, Lawrence W. Boes, John A. Lowe, New York City, Reavis & McGrath, Marshall G. Mintz, Los Angeles, Cal., for defendant Data General Corp.

## OPINION

ORRICK, District Judge.

Before the Court are seven actions challenging the manner in which Data General Corporation ("Data General") markets its computer equipment. Three of the actions were originally filed in this district[1] and four were transferred here by the Judicial Panel on Multidistrict Litigation ("the Panel") for consolidated or coordinated pretrial

1. *Fairchild Camera & Instrument Corp. v. Data General Corp.*, No. C–78–2418 (N.D.Cal., filed Oct. 1978); *SCI Systems, Inc. v. Data General Corp.*, No. C–78–2417 (N.D.Cal., filed Oct. 1978); *Digidyne Corp. v. Data General Corp.*, No. C–78–1261 (N.D.Cal., filed June 1978).

2. In May, 1979, the Panel transferred three actions to this Court: *Bytronix Corp. v. Data General Corp.*, No. 78–3832–RF (C.D.Cal., filed Oct. 1978); *Data General Corp. v. Ampex Corp.*, No. 79–1247 (D.N.J., filed Aug. 1978); *Data General Corp. v. Ampex Corp.*, No. 77–0636 (D.N.J., filed Mar. 1977). In June, 1979, the Panel conditionally transferred here *Data Compass Corp. v. Data General Corp.*, No. 79–1784–AA (C.D.Cal., filed Feb. 1979).

In November, 1979, the Panel conditionally transferred here three additional actions: *Data General Corp. v. Data National Corp.*, No. 78–2869–K (D.Mass., filed Nov. 1978); *Data General Corp. v. Ampex Corp.*, No. 79–1342–MRP (C.D.Cal., filed Apr. 1979); *Data General Corp. v. Ampex Corp.*, No. 79–193–T (D.Mass., filed Jan. 1979). Because those three actions were transferred here after the filing of the cross-motions for summary judgment that are the subject of this Opinion, the Court's rulings herein do not apply directly to those actions. The seven actions which are directly affected by this Opinion will hereinafter be referred to collectively, unless otherwise noted.

3. In five of the seven consolidated actions, Data General is aligned as the sole defendant. In the remaining two actions (both of which were brought by Data General against Ampex),

proceedings.[2] Plaintiffs[3] claim that, among other things, Data General ties the licensing of its software to the sale of its central processing units in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (hereinafter cited as "Sherman § 1") and § 3 of the Clayton Act, 15 U.S.C. § 14 (hereinafter cited as "Clayton § 3"). In addition, plaintiff Ampex Corporation ("Ampex") claims that Data General unlawfully ties the sale of its central processing units to the sale of its memory boards.

Following more than a year of discovery encompassing the production of over 600,000 documents, the taking of nearly 150 depositions and the exchange of hundreds of interrogatories and requests for admission, the parties filed cross-motions for summary judgment in accordance with the briefing procedures outlined in § 3.30 of the Manual for Complex Litigation ("the Manual").[4] Plaintiffs contend that Data General's tying arrangements possess each of the

Data General is nominally the plaintiff. Because all of the antitrust claims place Data General in a defense posture, Data General will be referred to herein as the defendant and all of the non-Data General parties will be referred to collectively as the plaintiffs.

4. Section 3.30 of the Manual directs the moving party to submit separate narrative statements of each of the facts and legal contentions on which it relies. The opposing party must admit or deny each factual statement and respond to each legal contention. Plaintiffs initially submitted 77 factual statements and 25 legal contentions. Supporting each factual statement were fact citations and evidentiary documents from which the citations were excerpted. Data General responded with direct responses, factual assertions, and comments addressed to each factual statement and with a brief addressed to the legal issues. In support of its cross-motion for summary judgment, Data General submitted 163 factual statements, 52 legal contentions, and another brief. The documents submitted to substantiate its factual statements and assertions included a compilation of 59 affidavits and declarations and 3 volumes of tabbed evidentiary materials. Each side then responded to the other's first-round submissions. Supplementary fact citations, affidavits and declarations, and evidentiary materials were filed. In addition, plaintiffs Ampex, Bytronix, and Data Compass submitted separate briefs, affidavits, and evidentiary support.

elements of *per se* tying violations. Data General argues that it lacks the requisite economic power in the tying product markets and therefore no tying violation can be shown. The Court has painstakingly reviewed the voluminous record and finds, for reasons set forth below, that there exist genuine issues of material fact sufficient to preclude summary judgment in favor of either plaintiffs or defendant. The parties must proceed to trial limited to the question whether Data General possesses sufficient economic power in the tying product markets appreciably to restrain competition in the tied product markets.

I

A.

All of the parties to this litigation are corporations engaged in the design, manufacture and/or marketing of computer equipment. The items in issue are central processing units ("CPUs"), peripheral products, including memory devices, and operating systems software. CPUs process data. Peripheral products translate data from human-readable to machine-readable form, and vice versa, in conjunction with CPUs' data processing activities. Memory devices receive, store, and supply data. CPUs, peripheral products, and memory devices are "hardware" items and each is separately plugged into the computer chassis. Computer programs, known generally as "software," tell the hardware items which tasks to perform. Operating systems software provides the basic instructions for the operation of a computer in any practical application. Applications software is designed to perform specific data processing tasks. Operating systems software essentially serves as the liaison between the applications software and the hardware.[5]

Data General manufacturers and markets all of the items in issue here: CPUs, peripheral products, memory devices, and software. Data General's CPUs bear the trademark "NOVA." All of the plaintiffs, except Data Compass Corporation ("Data Compass"), manufacture CPUs and market them in competition with Data General's NOVA CPUs. Most of the plaintiffs do not manufacture all of the other hardware and software items which together comprise a complete computer system.[6] Plaintiffs' CPUs are designed to be capable of functioning (whether as is or as modified) with the software which Data General makes available for use with its NOVA CPUs; they are sometimes referred to as "NOVA emulators."[7] The obvious object of plaintiffs' marketing strategy is to offer consumers the option of assembling a multi-brand computer system composed of CPUs manufactured by plaintiffs and memory devices, peripheral products, and software provided by Data General or other computer companies. In addition, plaintiff Ampex competes with Data General in the sale of memory devices as well as CPUs. Ampex aims to sell its memory boards to customers who buy their CPUs from Data General, from Ampex or from third parties.

This litigation focuses on three of Data General's marketing practices. First, Data General makes its software available pursuant to a Program License Agreement which precludes the licensee from using Data General's software with any CPUs not designated by Data General. With two exceptions not relevant here, Data General has only designated its own CPUs for use with its licensed software.[8] Second, Data Gener-

---

**5.** The software items in issue here are operating systems software. Unless otherwise noted, the term "software" will refer hereinafter to operating systems software.

**6.** Two plaintiffs are involved in the software market. Fairchild has developed software specifically for use with the CPUs which it manufactures. Data Compass develops its own software, but markets it along with CPUs which it purchases from Data General. A third plaintiff SCI is in the process of developing software for use with its CPUs.

**7.** Data General claims that plaintiffs misappropriated its trade secrets and proprietary information in the development of their NOVA-emulating CPUs. The trade secrets issues will be litigated immediately following the resolution of the antitrust issues.

**8.** Data General has approved the use of its software with CPUs manufactured by ROLM

al requires its software licensees to purchase a minimum amount of Data General's hardware (*i. e.*, a "minimum equipment configuration" of memory devices and peripheral products) or to pay a license charge. Third, Data General requires initial purchasers of its CPUs to purchase a minimum amount of memory equipment.[9]

### B

This Court's involvement in what is now complex, multi-party litigation began with the filing here of a simple, two-party, trade secrets case in June, 1978. Digidyne Corporation ("Digidyne") sued Data General alleging that Data General was misrepresenting that Digidyne had appropriated its trade secrets and proprietary information. Digidyne sought a declaratory judgment that it had not done so, as well as substantial compensatory and punitive damages. Data General responded with a counterclaim alleging misappropriation of trade secrets, copyright infringement, inducement of breach of contract, unfair competition, and interference with prospective advantage. When Digidyne amended its complaint to allege antitrust violations (unlawful tying arrangements in violation of Sherman § 1 and Clayton § 3, and attempt to monopolize in violation of § 2 of the Sherman Act, 15 U.S.C. § 2), the framework within which the larger litigation eventually developed was thereby established. In broad outline: Data General has separately charged Digidyne, Fairchild Camera and Instrument Corporation ("Fairchild"), SCI Systems, Inc. ("SCI"), and Ampex with misappropriation of trade secrets and related state law violations; each of these companies as well as Bytronix Corp. ("Bytronix"), claims that Data General is liable for antitrust violations, notably unlawful tying practices. The action involving Data Compass differs somewhat from the others insofar as Data General's counterclaims focus on alleged breaches of contract rather than misappropriation of trade secrets.

Once it appeared that the simple trade secrets case had become neither simple nor primarily a trade secrets case, the Court assumed the supervisory role recommended by the Manual. The case was first broken into its two major substantive components. Discovery and pretrial preparation have proceeded solely on the antitrust issues, while discovery regarding the trade secrets and related issues has been temporarily stayed. The antitrust part of the case was further bifurcated for pretrial and trial purposes into separate determinations of liability and damages.

### II

#### A

▇ Antitrust law treats tying arrangements harshly. Proof that a tying arrangement possesses certain critical elements will render it illegal *per se* under Sherman § 1, Clayton § 3, or both. The Supreme Court initially applied the *per se* rule to tying arrangements in 1947, *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), and has repeatedly reaffirmed that holding. *See, e. g., United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 612 n.1, 97 S.Ct. 861, 863 n.1, 51 L.Ed.2d 80 (1977) (hereinafter cited as "*Fortner II*"); *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 498–99, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969) (hereinafter cited as "*Fortner I*"); *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 8, 78 S.Ct. 514, 519, 2 L.Ed.2d 545 (1958). The oft-quoted rationale for subjecting tying arrangements to the *per se* rule is as follows:

> "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any

Corporation and Nippon Minicomputer Corporation, neither of whose computer products compete with products offered by Data General in the United States and Europe. Data General has refused requests from other manufacturers to license its software for use with their CPUs.

Data General's factual assertion in response to plaintiffs' fact statement II, A, 3.

**9.** Data General will also sell CPUs on a replacement basis from its spare parts list. *See* Section IV, A, 2, *infra*.

redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

\* \* \* \* \* \*

For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed 'tying agreements serve hardly any purpose beyond the suppression of competition.' *Standard Oil Co. of California [and Standard Stations] v. United States*, 337 U.S. 293, 305–306 [69 S.Ct. 1051, 1058, 93 L.Ed. 1371]. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products." *Id.* at 5–6, 78 S.Ct. at 518 (footnote omitted).

### B

Plaintiffs must establish three elements in order to make out a *per se* violation of Sherman § 1. First, there must be two separate products, with the purchase of one (the "tying product") conditioned upon the purchase of the other (the "tied product"). Second, the seller must possess sufficient economic power in the tying product market appreciably to restrain competition in the tied product market. Third, a not insubstantial amount of commerce in the tied product market must be affected. *Fortner I, supra*, 394 U.S. at 499, 89 S.Ct. at 1256, quoting *Northern Pacific Ry. Co. v. United States, supra*, 356 U.S. at 6, 78 S.Ct. at 518; *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1212 (9th Cir. 1977).

It was traditionally understood that a tying arrangement would run afoul of Clayton § 3 if it satisfied the first and either the second or the third of the elements required under the Sherman Act. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 608–09, 73 S.Ct. 872, 880, 97 L.Ed. 1277 (1953). Recently, however, the neat distinction between tying arrangements that violate Sherman § 1 and those that violate Clayton § 3 has faded beyond recognition. The Ninth Circuit has indicated that the requisite elements under the two statutes are now "virtually identical." *Moore v. Jas. H. Matthews & Co., supra*, 550 F.2d at 1214. *See also* von Kalinowski, 9 Antitrust Laws and Trade Regulation § 64.05[2] at 64–91 (1979). However, it has not been clearly stated whether the differences between the two standards were resolved in favor of the more stringent Sherman Act requirements, the less stringent Clayton Act requirements, or a new set of requirements. *Moore* suggests that all three Sherman Act elements now govern in both contexts inasmuch as the Ninth Circuit proceeded directly from the statement that the Sherman § 1 and Clayton § 3 standards are practically indistinguishable to the statement that all three elements must be satisfied under Sherman § 1. If the same standards apply under both statutes, and the Sherman Act requires all three elements, then the inescapable conclusion by which this Court is guided is that the Clayton Act also requires all three elements.[10] In one of the few

10. In light of this conclusion, it is unnecessary to reach Data General's contention that computer software is not "goods, wares, merchandise, machinery, supplies or other commodities" within the scope of the Clayton Act.

opinions to address this precise issue, the Fifth Circuit has reached the same conclusion. *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 428 (5th Cir. 1978).

### C

Three caveats accompany the general rule that a tie-in is illegal *per se* when it involves (1) separate products sold together (2) by a seller with economic power in the tying product market and (3) a not insubstantial amount of commerce in the tied product market is affected.

■ First, plaintiffs must do more than prove the three elements. In order to recover under the Sherman and Clayton Acts, 15 U.S.C. § 15, plaintiffs must also prove that they were in fact damaged. *Gray v. Shell Oil Co.*, 469 F.2d 742, 749 (9th Cir. 1972), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973). They must show that they have suffered *some* actual injury and that their injury was causally linked to defendant's antitrust violation. *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977).[11]

■ Second, some courts have carved limited inroads into the rigid *per se* rule by recognizing exceptional circumstances in which business justifications render lawful a tie-in that otherwise possesses the requisite elements of *per se* illegality. *See, e. g., Susser v. Carvel Corp.*, 332 F.2d 505, 520 (2d Cir. 1964), *cert. dismissed*, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); *Baker v. Simmons Co.*, 307 F.2d 458 (1st Cir. 1962); *United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545 (E.D.Pa.1960), *aff'd per curiam*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961). Although both the Supreme Court and the Ninth Circuit have noted in *dicta* that business justifications may "save" a tie-in, *Fortner I, supra*, 394 U.S. at 506, 89 S.Ct. at 1260; *Moore v. Jas. H. Matthews & Co., supra*, 550 F.2d at 1217, neither court has held that any particular tie-in would have violated the antitrust laws but for legitimate business justifications.[12]

■ Third, the assessment of the legality of a tying arrangement does not necessarily end with a finding that some or all of the elements of a *per se* violation are absent. A tying arrangement may nonetheless contravene Sherman § 1 under the rule of reason test. *Fortner I, supra*, 394 U.S. at 499–500, 89 S.Ct. at 1257. At the present stage of this litigation, plaintiffs rely on the *per se* rule and have not attempted to show that Data General's alleged tying arrange-

---

11. It has occasionally been stated that plaintiffs must satisfy two additional requirements in order to prove an illegal tie-in. That is, they must show that the seller of the tying product has an economic interest in the tied product and that buyers have been subjected to "some modicum of coercion." *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1216 (9th Cir. 1977). However, these factors have not been generally recognized as additions to the governing three-part (plus fact of damage) test. Rather, they are taken into account in the context of the separate products and economic power issues. *See, e. g., Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449–50 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Hill v. A–T–O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976); *BBD Transportation Co. v. United States Steel Corp.*, 1976–2 Trade Cas. ¶ 61,079 at 69,874 (N.D.Cal.1976) (CCH).

12. Some courts have evaluated alleged business justifications in the course of determining whether each of the requisite elements has been established (most asserted justifications pertain to the separate products issue). Other courts view justifications as affirmative defenses to be taken into account after all of the elements have been separately considered. The Ninth Circuit has employed the latter approach in two of its leading tie-in cases. *Moore v. Jas. H. Matthews & Co., supra* n.11; *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). Under this approach, the defendant bears the burden of proving that his case fits within the narrow contours of the business justification defense. *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55, 68 n.12 (4th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970); *Anderson Foreign Motors v. New England Toyota Distributors*, 475 F.Supp. 973, 981 (D.Mass.1979).

ments create an unreasonable restraint of trade. Therefore, this Opinion is addressed solely to the question whether Data General's alleged tying arrangements are illegal *per se.*

## III

### A

■ Summary judgment is appropriate where "there is no genuine issue as to any material fact and * * * the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). At the core of the disposition of a motion for summary judgment is the determination of which issues are "genuine" and which facts are "material." A genuine issue exists where "sufficient evidence supporting the claimed factual dispute [is] shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). A material fact is one which, under applicable principles of substantive law, must exist in order to support a judgment in favor of the moving party. *Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 439 (9th Cir. 1979).

■ The moving party bears the burden of establishing the absence of any genuine issue of material fact. In determining whether that burden has been satisfied, all evidence and inferences are to be viewed in a light favorable to the party opposing the motion. *Catalano, Inc. v. Target Sales, Inc.,* 605 F.2d 1097, 1101 (9th Cir. 1979), citing *Mutual Fund Investors v. Putnam Management Co.,* 553 F.2d 620, 624 (9th Cir. 1977).

After Justice Clark wrote that "summary procedures should be used sparingly in complex antitrust litigation," *Poller v. Columbia Broadcasting Co.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), district courts have shied away from the use of Rule 56 in antitrust cases. However, it is well established that "summary judgments have a place in the antitrust field, as elsewhere," *White Motor Co. v. United States,*

372 U.S. 253, 259, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963), and that the *Poller* warning was concerned primarily with cases, typically involving conspiracy allegations, "where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting Co., supra,* 368 U.S. at 473, 82 S.Ct. at 491; *White Motor Co. v. United States, supra,* 372 U.S. at 259, 83 S.Ct. at 699. Furthermore, summary judgment has been explicitly sanctioned for use in antitrust cases involving alleged *per se* violations where the law is well developed and "the gist of the case turns on documentary evidence." *Id.*

> "Where there is conspiracy or attempt to monopolize, courts do require proof of specific intent, and this normally involves trial. We have no such requirement in *tying* cases." *Capital Temporaries, Inc. of Hartford v. Olsten Corp.,* 506 F.2d 658, 667 (2d Cir. 1974) (citation omitted, emphasis added).

### B

■ Where the parties submit summary judgment motions but the Court determines that a final judgment cannot be rendered without proceeding to trial, Rule 56(d) directs the court to specify the material facts that have been established beyond dispute and those that remain in dispute.

> "If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the

trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly."

The purpose of a Rule 56(d) order, which is analogous to a pretrial order under Rule 16, is to salvage all constructive results of summary judgment proceedings. 6 Pt. 2 Moore's Federal Practice ¶ 56.20[1] at 56–1203 (1979).[13]

The Ninth Circuit has expressly approved the use of Rule 56(d) and rejected the contention that the procedure infringes the litigants' right to a jury trial. In *Diamond Door Co. v. Lane-Stanton Lumber Co.*, 505 F.2d 1199 (9th Cir. 1974), petitioners in a bankruptcy proceeding moved for summary judgment on their claim that the alleged bankrupt had, while insolvent, made a preferential transfer in violation of the bankruptcy statute. Six elements had to be established in order to make out the alleged violation. The district court ruled that five of those elements were established beyond dispute and that genuine issues of material fact existed only with respect to the sixth element (whether the alleged bankrupt was insolvent at the time of the transfer). Pursuant to Rule 56(d), the court entered an order on the basis of the five elements that had been established and called for a jury trial to determine the sole remaining issue (*i. e.*, insolvency). The alleged bankrupt argued on appeal that the procedure violated his right to a jury trial. The Ninth Circuit held that the use of Rule 56(d) was proper, the procedure did not invade the jury's province because summary adjudication was only rendered upon the facts that were undisputed, and the record fully supported the district court's determination that there was no genuine issue of material fact with respect to five of the six elements of the alleged violation. *Id.* at 1203–06.

In the antitrust context, the Ninth Circuit has also sanctioned procedures which, like Rule 56(d), require the trial court to adjudicate some of the elements of a claim and submit only the remaining elements to the jury. *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), involved the claim by a class of franchisees that their franchisor, Chicken Delight, imposed unlawful tying restrictions. After the case was presented—but before it was submitted—to the jury, plaintiffs moved for a directed verdict. The district court ruled in plaintiffs' favor on the three elements of the alleged tying violation and on the fact of damage element and sent only one issue—whether the tie-in was justified—to the jury. The jury found that the tie-in was not justified and judgment was rendered for the plaintiffs. The Ninth Circuit affirmed the finding of liability, remanded for a new trial on the damages issue, and neither stated nor suggested any objections to the procedures employed by the trial court.

In conformity with Rule 56(d) and the relevant case law, this Court has attempted to salvage all constructive results of the monumental efforts the parties have invested in these summary judgment proceedings. As elaborated below, the tying violations alleged here involve five issues: (1) whether there are tie-ins involving two separate products; (2) whether Data General possesses sufficient economic power in the tying product markets to restrain competition in the tied product markets; (3) whether the tie-ins affect a not insubstantial amount of commerce in the tied product markets; (4) whether plaintiffs were damaged by the tie-ins; and (5) whether business reasons justify the otherwise unlawful tie-ins. The record contains genuine issues of material fact with respect to the economic power issue regarding both alleged ties. However, the Court finds that there are no genuine issues of material fact with respect to the other four issues (Nos. 1, 3, 4, and 5 as listed above). Thus, the cross-motions for summary judgment must be denied and the parties must proceed to jury trial on the economic power issue.

---

**13.** Although Rule 56(d) practice is occasionally described as "partial summary judgment," that term is a misnomer where, as here, no final judgment is rendered and the parties must proceed to trial. *Diamond Door Co. v. Lane-Stanton Lumber Co.*, 505 F.2d 1199, 1202 (9th Cir. 1974). *See also* 6 Pt. 2 Moore's Federal Practice ¶ 56.20[3–1] at 56–1214 (1979).

## IV

Having set out the legal standards governing both the proof of a *per se* tying violation and the use of summary judgment procedures, the Court must now apply that law to the facts of this case. The remainder of this Opinion will be structured as follows: for each of the three requisite elements of a *per se* tying violation, the additional fact of damage element, and the asserted defense of business justifications, the Court will first state the facts which under the substantive law it deems to be material and then discuss whether the record contains or lacks a genuine issue with respect to the facts material to each of the two alleged tie-ins.

## A

In determining whether two items are separate products or components of a single product, the Court is to focus on the "function of the aggregation." *Moore v. Jas. H. Matthews & Co., supra,* 550 F.2d at 1215; *Siegel v. Chicken Delight, Inc., supra,* 448 F.2d at 48. Among the subsidiary considerations to be taken into account are "whether the amalgamation of products resulted in cost savings apart from those reductions in sales expenses and the like normally attendant upon any tie-in, and whether the items are normally sold or used as a unit with fixed proportions." *Id.* Unless such factors are present, a finding of separate products is generally warranted. *Moore v. Jas. H. Matthews & Co., supra,* 550 F.2d at 1215.

## 1

Turning first to Data General's alleged tie-in between operating systems software (tying product) and CPUs (tied product), it is clear that neither item can function without the other.[14] However, the relevant inquiry is not whether the two items must be used together but whether they must come from the same seller. *Siegel v. Chicken Delight, Inc., supra,* 448 F.2d at 49.

Data General's own marketing practices refute the suggestion that the software and the CPU used in a particular computer system must necessarily be manufactured by the same company. First, Data General admits that it sells CPUs without requiring the purchaser to obtain Data General software for use therewith.[15] Second, Data General admits that its "price lists contain separate prices for its hardware and software and Data General charges the listed prices for the items of hardware and software which are described."[16] Third, Data General admits that, until the summer of 1978, the persons responsible for marketing software were different from those responsible for marketing hardware.[17]

The marketing practices of others in the industry also establish that software and CPUs need not be manufactured by the same company. Numerous companies market software alone, to be used with CPUs such as Data General's NOVA products.[18] Numerous companies, including several of the plaintiffs, market CPUs alone, to be used with software such as that licensed by Data General.[19] "Hundreds to thou-

---

14. Data General's fact statement 4(a) (see also Data General's factual assertion (b)(1) in response to plaintiffs' fact statement I, A, 1); plaintiffs' reply to defendant's fact contentions at 6–7 (failure to deny statement 4(a)).

15. Data General's response to plaintiffs' fact statement II, A, 2.

16. Data General's factual assertion (b) in response to plaintiffs' fact statement II, B, 6.

17. Deposition of Robert Kiburz, Data General's Eclipse Data Systems marketing manager, quoted at plaintiffs' fact citations II–B(1), tab 7.

18. Data General's supp. interrog. ans. (1st set), No. 11, dated May 11, 1979, quoted at plain-

tiffs' fact citations II–B(4), tab. 18; affidavit of James Burkhard, vice president of Baron Data Systems.

19. Data General's supp. interrog. ans. (1st set), No. 20, dated May 11, 1979, quoted at plaintiffs' supp. fact citations II–B, tab. 6; affidavit of Stephen R. Steinberg, attorney for Data General, quoted at plaintiffs' fact citations I–B, tab. 1. There is a genuine issue of fact concerning whether plaintiffs' CPUs are functionally equivalent to Data General's CPUs (*i. e.,* whether they are fully compatible with Data General's software). *Compare* plaintiffs' fact statement I,B,8, and citations referenced therein, with Data General's factual assertions in response

sands" of companies are engaged in the business of buying CPUs from one company and peripheral equipment from others, developing software, and then selling the integrated system as a package.[20] At least three companies that market both software and CPUs make their software available on an "unbundled" basis—*i. e.*, without also requiring the purchase of their own CPUs.[21]

In sum, with respect to the subsidiary consideration of whether software and CPUs are "normally sold or used as a unit with fixed proportions," *id.* at 48, the undisputed material facts establish that they are not normally sold as a unit. They need not be manufactured by the same company and they are frequently sold separately by Data General and by other computer companies. Neither are they normally sold in fixed

proportions. Although a CPU can only operate with one software program at any one time,[22] there are several different software programs that may be used with any particular CPU.[23]

With respect to the subsidiary consideration of whether the bundling of software and CPUs results in "cost savings apart from those * * * normally attendant upon any tie-in," *id.*, Data General claims that such cost savings are attributable to its coordinated research and development ("R&D") efforts.[24] However, the record lacks factual support for that contention. Data General establishes beyond dispute that joint R&D yields technological benefits in the initial design and gradual perfection of both CPUs and related soft-

thereto, and evidentiary materials cited therein. Although this dispute is material to the determination of the extent of plaintiffs' damages—a factual determination to be made by the jury at trial—it is not material to the question whether software and CPUs are separate products. For purposes of establishing separate products, the dispositive facts regarding "compatibility" are not in dispute: numerous companies market CPUs, in competition with Data General's NOVA CPUs, for use with Data General's software.

20. Deposition of Stephen Gaal, Data General's North American manager, systems engineering, quoted at plaintiffs' fact citations II–B(4), tab 17.

21. Data General claims that "plaintiffs have offered no evidence that CPU manufacturers other than Data General have in fact licensed (as distinguished from offering to license) operating systems software for use on competing CPUs." Data General's factual assertion (a) in response to plaintiffs' fact statement II,B,9. However, *Data General's own submissions* acknowledge that both IBM and Intel have in fact licensed their software for use on other companies' CPUs. Data General's factual assertion (b)(5) in response to plaintiffs' fact statement II,B,9 (re IBM); deposition of Edson D. de Castro, Data General's president, quoted at plaintiffs' fact citations II–B(4), tab 16 (re IBM); deposition of Roger Borovoy, Intel's general counsel, quoted at Data General's evidentiary materials, tab 3 (re Intel). In addition, Data General provides no specific facts disputing plaintiffs' submissions which establish that Zilog will also make its software available sepa-

rately from its CPUs. Deposition of William B. Sweet, Zilog's director of marketing, quoted at plaintiffs' supp. fact citations II–B, tab 2.

On the other hand, plaintiffs have not presented specific facts disputing Data General's argument that, among the companies that offer both software and CPUs, it is the "predominant practice" to license software only for use on the licensing company's CPUs. Declaration of Richard L. Bernacchi, ¶ 5. This fact alone neither calls for a finding that software and CPUs are components of a single product nor precludes a finding that they are separate products. First, "[a] favorable intra-industry comparison, although relevant, is by no means conclusive on the single product issue." *Anderson Foreign Motors, Inc. v. New England Toyota Distributors, Inc., supra* n.12. Second, in the particular circumstances of this case, the undisputed facts (including separate availability, separate pricing, and separate marketing of CPUs and software, and the existence of numerous companies that market either software or CPUs, but not both) establish that software and CPUs are separate products within the meaning of the antitrust laws.

22. Data General's factual assertion (d) in response to plaintiffs' fact statement II,B,8.

23. Deposition of George Seligman, Data General's vice president of small business systems development, quoted at Data General's evidentiary materials, tab 1.

24. Data General's factual assertions (b)(2) and (b)(5) in response to plaintiffs' fact statement I,A,1. (See also Data General's fact statements 4(b), 4(e) and 24.)

ware.[25] Yet there is no factual showing, beyond vague and conclusory references to "cost savings" and "lower costs,"[26] of measurable economic benefits attributable to joint R&D. Moreover, there is no showing that any of the asserted benefits of joint R&D would be sacrificed if Data General were to offer its software apart from, as well as together with, its CPUs. Inasmuch as plaintiffs seek not to prevent bundling but to make unbundling an additional option, Data General cannot, as a matter of law, support its single product argument by suggesting that its costs are lower because CPUs and software are developed together than they would be if they were developed separately[27] or if Data General were forced to develop software so that it could be used with other companies' CPUs.[28] The question is not whether joint R&D is more economical than separate R&D, but whether joint R&D calls for joint marketing. The record is barren of any factual support for an affirmative answer to that question. Thus, in light of the undisputed material facts in the record, the Court is compelled to conclude that software and CPUs are separate products.

 Data General attempts to circumvent that conclusion by contending that

customers prefer to obtain the items from the same vendor,[29] that its software will not function reliably with foreign[30] CPUs,[31] and that it is extremely difficult to service its software when used with foreign CPUs.[32] Although these considerations are relevant to the ultimate determination of whether the alleged tie-in is unlawful, the governing case law in this circuit takes them into account as affirmative, business justification defenses rather than folding them into the separate products issue.[33] Each of Data General's contentions will be fully discussed in section IV, E, *infra*.

In order to satisfy the first element of an unlawful tie-in, plaintiffs must establish not only that Data General markets two separate products but that it requires customers to purchase both of them pursuant to a tying scheme. In this case, the crucial issue with respect to the first element is whether software and CPUs are distinct products. The existence of a tying scheme is virtually undisputed. Data General admits that it licenses its software under a Program License Agreement that restricts the use of such software to a "designated" CPU, and that, with two exceptions not relevant to this case, Data General will designate only its own CPUs for use with its software.[34]

**25.** Seligman affidavit; declaration of George Franzen, Data General's software systems programmer.

**26.** De Castro affidavit ¶¶ 12(h) and 15(a); Seligman deposition, quoted at Data General's evidentiary materials, tab 1A. *See also supra* n. 24.

**27.** Seligman affidavit ¶¶ 18–19.

**28.** *Id.* ¶ 20.

**29.** Data General's factual assertion (b)(6) in response to plaintiffs' fact statement I,A,1. (See also Data General's fact statement 4(f).)

**30.** The term "foreign" refers to a CPU manufactured by a company other than the licensor of the software with which it is used.

**31.** Data General's factual assertion (b)(7) in response to plaintiffs' fact statement I,A,1. (See also Data General's fact statement 4(g).)

**32.** Data General's factual assertion (b)(8) in response to plaintiffs' fact statement I,A,1. (See also Data General's fact statement 4(h).)

**33.** *Moore v. Jas. H. Matthews & Co., supra* n. 11, 550 F.2d at 1217–18; *Siegel v. Chicken Delight, Inc., supra* n. 12, 448 F.2d at 50–52. Reference to "customer need" in the separate products discussion in *ILC Peripherals Leasing Corp. v. IBM*, 448 F.Supp. 228, 232 (N.D.Cal. 1978), does not affect the analysis here. In that case, the Court found that the aggregation of computer peripheral devices constituted a single product, in part because the purpose of combining the items was to enhance their technological capabilities and satisfy a recognized customer need for increased on-line storage capacity. *Id.* This case does not involve physical aggregation and there is no evidence that bundling for marketing purposes yields any technological benefits apart from those attributable to joint R&D (which, for reasons discussed above, does not require joint marketing).

**34.** Data General's response to and factual assertions re plaintiffs' fact statement II,A,3.

Plaintiffs further contend that Data General reinforces and expands this basic tie-in by requiring customers to purchase a minimum amount of its memory and peripheral products in order to obtain its software. Although customers may avoid this "minimum equipment configuration" ("MEC") requirement by paying a program license charge, plaintiffs contend that the charge is so expensive that customers are forced to take the equipment specified in the MEC.[35] Data General admits the existence of the MEC, but denies that the alternative license charge is prohibitively expensive.[36]

Even though the compulsion aspect of the MEC is a disputed issue of material fact, the existence of the basic software-CPU tie-in by virtue of the Program License Agreement remains undisputed. Thus, the undisputed material facts establish that software and CPUs are separate products subject to, a tie-in requirement, thereby satisfying the first requisite element of an unlawful tie-in.

### 2

The Court now turns to Ampex' additional claim that Data General maintains a tie-in between its CPUs (tying product) and its memory devices (tied product). With respect to the function of the aggregation, the starting point is that neither a CPU nor a memory board can function independently of the other.[37] Yet they are physically distinct items; each is located on a separate circuit board which is plugged into the chassis in which the computer system is housed.[38] Thus, the analysis focuses on whether both must be manufactured by the same company.

As in the case of software and CPUs, Data General's marketing practices indicate that the items are separate products. Data General will sell memory boards apart from CPUs (although, as described *infra*, it will not make initial sales of CPUs without memory boards). Data General claims that the memory boards that it sells on an unbundled basis are different from the memory boards that it sells together with its CPUs. It labels the former "add-on memory" and the latter "main memory." [39] However, the difference is in the name rather than in the functional capabilities of the memory board. Data General's manager of product marketing programs stated that the memory boards that Data General sells bundled with its CPUs are "form, fit and function identical" to the boards it sells separately as add-on memory.[40] Data General's president stated that the two are easily interchanged:

> "The addressing jumpers have to be changed * * *. It involves *moving* a couple of wires on the [circuit] board depending on how the particular memory is designed * * *. [It takes] ten fifteen minutes." [41]

---

**35.** Plaintiffs' fact statement III,A,2 and supporting citations.

**36.** Data General's response to and factual assertions re plaintiffs' fact statements III,A,2 and II,D,25.

**37.** Data General's factual assertion (c) in response to Ampex' fact statement IV,A,1; factual assertion (b) in response to Ampex' fact statement IV,B,3.

**38.** Two of Data General's CPUs, the NOVA 4/C and the microNOVA, are located on the same circuit board as their memory devices. Ampex does not compete with Data General in these two markets and has excluded them from the scope of this litigation. Ampex' fact statement IV,A,1; Ampex' reply brief at 8, n. 7. Apart from these two products, Data General offers no *facts* to dispute the evidence that CPUs and memory devices are physically distinct. Data

General's factual assertions (a)(i) and (a)(ii) in response to Ampex' fact statement IV,B,2; affidavit of Gardner C. Hendrie, Data General's designer of "general purpose digital computers," ¶ 12 (referring only to NOVA 4/C and microNOVA). (See also Data General's fact statements 98–99, 108.)

**39.** Data General's factual assertion (c) in response to Ampex' fact statement IV,B,5; (See also Data General's fact statements 27 and 107); de Castro affidavit at 5–6, n. 2.

**40.** Deposition of John Scanlon, Data General's manager of product marketing programs, quoted at Ampex' fact citations IV–B, tab 3.

**41.** De Castro deposition, quoted at Ampex' reply citations, tab 17.

The fact that Judge Christensen used the terms "main memory" and "auxiliary memory" in describing some of IBM's products in *Telex Corp. v. IBM*, 367 F.Supp. 258, 274 (N.D.Okl.1973), *rev'd on other grounds*, 510 F.2d 894 (5th Cir. 1975), is not controlling here. First, Judge Christensen's appellation appeared in an altogether different context, unrelated to the single-separate products question at issue here. Second, there is no indication that Judge Christensen was not simply adopting IBM's terminology for descriptive purposes, without considering whether the items were functionally equivalent. The undisputed facts in the record in this case establish that the add-on memory that Data General sells on an unbundled basis is virtually identical to the main memory that it sells bundled with its CPUs. In short, Data General has not raised a genuine dispute with respect to the material fact that it sells the tied product separately as well as bundled with the tying product.

■ As in the case of software and CPUs, Data General proffers undisputed facts establishing that many other companies that produce both CPUs and memory boards market their CPUs together with memory.[42] Whether Ampex is among the companies engaged in such marketing practices is the subject of dispute.[43] Although these facts may help to explain why Data General ties the sale of CPUs to the purchase of memory boards (or, perhaps, why *other* companies have followed suit), they are insufficient to support a finding that CPUs and memory are a single product. The relevant consideration to which these facts pertain is whether the items are normally sold or used as a unit. In light of the

undisputed fact that Data General (and other companies such as Ampex) will sell memory boards separately, it cannot be concluded that memory boards and CPUs are normally sold as a unit. If the facts summarized above were to be presented to a jury, the Court would be compelled to direct a verdict in favor of Ampex on the separate products issue.

■ In addition to the proof that Data General's CPUs and memory boards are often not *sold* as a unit, the record contains undisputed facts establishing that they frequently are not *used* as a unit. Evidence such as the following affidavit of Billy Ray Slater, principal engineer at Forney Engineering, goes far toward demonstrating that Data General's CPUs and memory boards are separate products:

"Data General requires us to purchase at least 8KW of core memory with each NOVA 3 CPU we buy. Thus, in order to configure our systems properly, Forney must pull the Data General board out of the chassis, and replace it with a 16KW Ampex board (after which we add three more Ampex boards). This means that Forney must buy a number of Data General boards that it does not want and for which it has no use. These Data General memory boards are currently in inventory at Forney. At this time, we have 28 Data General 8KW memory boards in the storeroom."[44]

Data General admits that some of its customers remove the memory boards that come with its CPUs and replace them with other companies' memory boards.[45] It attempts to blunt the impact of that fact by claiming that foreign memory boards func-

---

**42.** Data General's factual assertions (b)–(d) in response to Ampex' fact statement IV,B,10 (see also Data General's fact statements, 124, 127–28); affidavit of Lewis H. Van Antwerp, director of corporate pricing, NCR Corp., ¶ 5; deposition of Leo J. Chamberlain, vice president and general manager, Mil Spec Computer Division, ROLM Corp., quoted at Data General's evidentiary materials, tab A–20,1; deposition of Charles Allen Dorsett, SCI product manager, quoted at Data General's evidentiary materials, tab A–20,11.

**43.** *Compare* depositions of Gordon B. Baumeister, Steve Quering, William Prosenik, and John Jory, quoted at Data General's evidentiary materials, tabs A–20,3, A–20,5, A–20,6–7, and A–20,9, respectively with Ampex' interrog. ans. (1st set) No. 97, quoted at Ampex' reply citations, tab 21.

**44.** Ampex' fact citations IV–B, tab 25.

**45.** Data General's response to Ampex' fact statement IV,B,8.

tion less reliably than Data General memory boards when used with Data General CPUs and by suggesting that the three companies specifically mentioned in Ampex' evidentiary submissions are the exception to the general customer practice of using Data General's memory along with its CPUs.[46] Neither argument raises a genuine issue of material fact. With respect to the reliability argument, the record does contain a genuine dispute concerning the extent to which foreign memory boards are *fully* compatible with Data General's CPUs.[47] However, this dispute is not material to the single-separate products issue because the undisputed facts establish that some companies, such as Forney Engineering, regularly use foreign memory boards with Data General CPUs. The extent to which technological modifications may be required, or servicing problems may be encountered, is not relevant to the question whether Data General's CPUs and memory boards are used as a unit. With respect to the argument that the three named customers are the exception rather than the rule, Data General's evidentiary support is too conclusory and self-serving to raise a genuine dispute.[48] Moreover, even if its evidence is accepted as fully competent and totally accurate, it is insufficient to support a finding that CPUs and memory boards are a single product. It remains undisputed that at least some customers do not view CPUs and memory boards as a single product. Other customers who use Data General's memory boards along with its CPUs *may* view the items as components of a single product; but they may also buy the items together because of Data General's conceded bundling scheme. To conclude that a tie-in is not illegal because customers acquiesce in it would be to stand antitrust law on its head.

In accord with *Siegel*, the Court has been examining the question whether Data General's CPUs and memory boards are "normally sold or used as a unit with fixed proportions." The undisputed facts in the record preclude a trier of fact from concluding that they are normally sold or normally used as a *unit*. The undisputed facts also preclude a finding that they are normally sold or used in *fixed proportions*. Data General admits that the amount of "main memory" which it has sold together with its CPUs has varied over time and that at least some of its CPUs may be used with a variety of memory boards.[49] Furthermore, the fact that Data General sells "add-on memory" to enable customers to expand their memory capacity establishes that the amount of memory to be used with each Data General CPU is not fixed, but varies according to the particular model CPU and the particular user's needs.

With respect to the remaining *Siegel* consideration—whether the bundling of the two items involves cost savings—Data General argues that coordinated R&D regarding CPUs and memory boards produces lower costs.[50] Yet Data General puts forth virtually no specific support for its conclusory statements. Moreover, it presents no evidence that the alleged lower costs have been passed along to consumers.[51] Thus, the record lacks factual evidence from which a jury might conclude that the bundled sale of CPUs and memory boards involves cost savings apart from those normally attendant upon any tie-in.

Data General also advances technological reasons, some of which involve eco-

---

46. *Id.*; Data General's fact statement 125.

47. *Compare* Ampex, fact statement IV,B,9 and fact citations IV–B, tabs 10, 26–36, with Data General's factual assertions in response to Ampex' fact statements IV,B,8 and IV,B,9 and citations referenced therein.

48. Data General's factual assertion (a) in response to Ampex' fact statement IV,B,10 and affidavits and evidentiary materials referenced therein.

49. Data General's response (a) and (b) and factual assertions (d) in response to Ampex' fact statement IV,B,4.

50. Data General's factual assertion (c) in response to Ampex' fact statement, IV,B,9.

51. *See* affidavits and evidentiary materials referenced in Data General's factual assertion (c) in response to Ampex' fact statement IV,B,9.

nomic considerations as well, in support of its joint sale of CPUs and memory. Data General argues that the joint development and design of the two items "is essential to assure the proper functioning of the various components of a computer in unison," [52] and that "[i]t would be cost prohibitive and ineffective to attempt to test and ship a computer or computer system without main memory." [53] Both of these arguments fail, as a matter of law, to support a single product finding in the absence of any showing (1) that the technological benefits would be lost if Data General sold its CPUs separately (as well as together with its memory boards), (2) that cost savings are passed along to consumers, or (3) that cost savings could not be reflected in price differentials between bundled and unbundled sales.

In light of the three factors relevant to the single-separate product issue, the undisputed facts compel the Court to conclude that CPUs and memory boards are separate products within the meaning of Sherman § 1 and Clayton § 3. The items are physically distinct; foreign memory boards will function in tandem with Data General's CPUs; at least some customers choose, even in the face of Data General's bundled sales, to substitute foreign memory for the Data General memory they have already purchased; and Ampex has sold approximately 5,000 memory boards specifically for use with Data General's CPUs. [54]

Data General concedes that it requires customers purchasing CPUs from its regular price list to purchase a minimum amount of memory along with the CPU. [55] However, Data General contends that that requirement is not a coercive tie-in because customers are free to purchase CPUs separately, without any memory, from its spare parts and components list. [56] The existence of this unbundled "option" does not save the memory purchase requirement from the strictures of the antitrust laws. First, Data General makes no showing in support of its bald claim that a customer initially seeking to acquire its CPU may take advantage of the spare parts list. The only two customers whom Data General identifies as having purchased CPUs separately from its spare parts list [57] were buying replacement CPUs and testified that they had been forced into buying undesired memory along with their original CPUs. [58] Second, and consistent with Data General's inability to produce evidence of unbundled initial purchases, undisputed facts establish that the spare parts list option is more theoretical than real. Data General has only published two such lists, one in 1969 and one in 1974. [59] One of its CPU models, the NOVA 3, has never been included and its NOVA 1200 line was not included for four years. [60] With respect to the NOVA CPUs that are listed, Data General neither advertises nor advises customers of the existence of the option of initially purchasing a CPU without memory

52. Data General's factual assertion (c) in response to Ampex' fact statement IV,B,9.

53. Data General's factual assertion (f) in response to Ampex' fact statement IV,B,9.

54. Declaration of Alvin Horowitz, Ampex manager of product marketing, quoted at Ampex' fact citations IV–E, tab 31.

55. Data General's factual assertion (c) in response to Ampex' fact statement IV,A,1. (See also Data General's fact statement 95.)

56. Data General's factual assertion (d) in response to Ampex' fact statement IV,A,1. (See also Data General's fact statements 96, 102.)

57. Data General's factual assertion (e) in response to Ampex' fact statement IV,A,1, and affidavits referenced therein. (See also Data General's fact statements 97, 156.)

58. Declaration of Erik Nakonechnyj, quoted at Ampex' fact citations IV–E, tab 2 (re Action Communications Systems, Inc.); declaration of Alvin V. Flory, Amdahl's director of material quoted at Ampex' reply citations, tab 14 (re Amdahl Corp.). The supplemental affidavit of John Park, Data General's director of support services, offers no indication that the "hundreds" of sales from the spare parts list involved initial CPU purchases rather than replacement purchases.

59. Ampex' reply citations, tab 5.

60. Data General's supp. interrog. ans. (1st set), Nos. 5 and 23, quoted at plaintiffs' fact citations I–A, tab 7.

from the spare parts list.[61] Third, Data General's pricing structure chills any potential use of the spare parts list for initial CPU purchases. It is less expensive to buy a CPU (and related parts such as frames and console) bundled with memory, using the regular price list, than to buy a CPU and related parts without *any* memory from the spare parts list.[62] It is hornbook law that differential pricing that makes an unbundled option uneconomical will not save the bundled "alternative" from antitrust liability. *United States v. Loew's, Inc.*, 371 U.S. 38, 43, 83 S.Ct. 97, 101, 9 L.Ed.2d 11 (1962); *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 283 (2d Cir. 1967).

Thus, Data General's requirement that any customer initially purchasing a CPU must also purchase a minimum amount of memory is a tie-in of two separate products within the meaning of the antitrust laws. The two computer cases on which Data General principally relies in its single product argument are of no avail here. In both *Telex Corp. v. IBM, supra,* and *ILC Peripherals Leasing Corp. v. IBM*, 448 F.Supp. 228 (N.D.Cal.1978), the courts were analyzing products and alleged tying restrictions that were different from those at issue here. The *Telex* court found that IBM's integration of memory control functions with data processing functions was not an illegal tie-in because "the integrated control * * * is wholly optional. IBM continues to offer central processing units without integrated controllers." *Telex Corp. v. IBM, supra,* 367 F.Supp. at 347. In contrast, the record in this case establishes beyond dispute that a customer initially desiring to purchase a Data General CPU has no practical option but to purchase Data General's memory board to go along with it. The *ILC Peripherals* court found that IBM's integration of a head/disc assembly into its Madrid disk

drive produced technological and economic benefits that were not available with unbundled equipment and reflected widespread industry practice; all relevant considerations called for the items to be deemed a single product. *ILC Peripherals Leasing Corp. v. IBM*, 448 F.Supp. at 232–33. In contrast, the record in this case establishes beyond dispute that all relevant considerations support a finding that Data General's CPUs and memory boards are separate products.

**B**

The second element that must be established in order to make out a *per se* tying violation is that "the seller has the power, within the market for the tying product, to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market." *Fortner II, supra,* 429 U.S. at 620, 97 S.Ct. at 867. In two leading tie-in decisions rendered during the past decade, *Fortner I, supra,* and *Fortner II, supra,* the Supreme Court refined and synthesized the governing considerations to be taken into account in determining whether a seller possesses the requisite economic power.

Three alternative indicia of economic power have been recognized. First, it may be shown that the seller occupies a dominant position in the tying product market. This is the most difficult index to prove and, although such proof would be sufficient to establish economic power, it is not necessary. *Fortner II, supra,* 429 U.S. at 620, 97 S.Ct. at 867; *Fortner I, supra,* 394 U.S. at 502–03, 89 S.Ct. at 1258; *Moore v. Jas. H. Matthews & Co., supra,* 550 F.2d at 1215. Second, it may be shown that the seller's product is sufficiently unique that he has "some advantage not shared by his competitors in the market for the tying product." *Fortner II, supra,* 429 U.S. at 620, 97 S.Ct. at 868. *See also Fortner I,*

---

**61.** De Castro deposition, quoted at Ampex' reply citations, tab 4; Ampex' fact citations IV–A, tabs 2–7, 11–15, 17–18 (testimony of Data General employees and third-party witnesses establishing Data General's practice of failing to advise customers of potential availability of

purchasing CPU without memory from spare parts list).

**62.** Ampex' reply citations, tab 6; Ampex' reply support, tabs 6–8, 10.

*supra*, 394 U.S. at 502–03, 89 S.Ct. at 1258; *Moore v. Jas. H. Matthews & Co., supra*, 550 F.2d at 1215. The Supreme Court has described such uniqueness in terms of a tying product's *legal, physical* or *economic* characteristics that confer special advantages upon the seller:

"Uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves. Such barriers may be legal, as in the case of patented and copyrighted products, *e. g., International Salt; Loew's*, or physical, as when the product is land, *e. g., Northern Pacific*. It is true that the barriers may also be economic, as when competitors are simply unable to produce the distinctive product profitably, but the uniqueness test in such situations is somewhat confusing since the real source of economic power is not the product itself but rather the seller's cost advantage in producing it." *Fortner II, supra*, 429 U.S. at 621, 97 S.Ct. at 868, quoting *Fortner I, supra*, 394 U.S. at 505 n. 2, 89 S.Ct. at 1259 n. 2.

Third, economic power may be shown where a substantial number of customers have accepted the tie-in *and* there are no explanations other than the seller's economic power for their willingness to do so. *Fortner II, supra*, 429 U.S. at 618 n. 10, 97 S.Ct. at 866 n. 10; *Moore v. Jas. H. Matthews & Co., supra*, 550 F.2d at 1216.

### 1

With respect to the software-CPU tie-in, the economic power inquiry focuses on whether Data General's software is unique under the standards articulated in *Fortner I* and *Fortner II*. The crux of Data General's cross-motion for summary judgment is its argument that the facts in the record cannot, as a matter of law, satisfy the economic power test.

■ Plaintiffs first claim that the copyright notices that Data General concededly attaches to its software [63] create legal barriers from which economic power may be presumed. It is well established that eco-

nomic power may be presumed where a tying product is patented or copyrighted. *United States v. Loew's, Inc., supra*, 371 U.S. at 45, 83 S.Ct. at 102; *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 157–58, 68 S.Ct. 915, 929, 92 L.Ed. 1260 (1948); *International Salt Co. v. United States*, 332 U.S. 392, 395–96, 68 S.Ct. 12, 14–15, 92 L.Ed. 20 (1947). In the above-quoted passage contained in both *Fortner I* and *Fortner II*, the Supreme Court reaffirmed the concept that barriers erected by patent and copyright law may confer the requisite economic power. However, the Court's emphasis in *Fortner II* upon the factual showing necessary to prove economic power serves to highlight some significant subtleties in the long-standing rule.

■ Notwithstanding implied suggestions to the contrary, the sole fact of the existence of a copyright notice has not been held to be sufficient to prove economic power. In *United States v. Loew's, Inc., supra*, the case on which plaintiffs principally rely, the tying items (copyrighted, popular movies) were found to be qualitatively superior to the tied items (copyrighted, little-known movies). *Id.*, 371 U.S. at 48–49, 83 S.Ct. at 103–104. The Second Circuit has explained that a presumption of economic power arose in *Loew's* not merely from the existence of the copyright on the tying products but from "the attractiveness of some of the films, as contrasted to the inferior quality of the others also required to be purchased in the package." *Capital Temporaries, Inc. of Hartford v. Olsten Corp., supra*, 506 F.2d at 663. The Ninth Circuit has also indicated that the existence of a patent (or, presumably, a copyright) does not *ipso facto* establish the requisite economic power. In *Rex Chainbelt Inc. v. Harco Products, Inc.*, 512 F.2d 993 (9th Cir. 1975), *cert. denied*, 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975), the court stated that a patentee who makes his patented product available only in conjunction with an unpatented product "runs the risk that the court may, in conjunction with the particular evidence in the

---

**63.** Data General's response to plaintiffs' fact statement II,C,(1),10.

case," find an illegal tying arrangement. *Id.* at 1002. The court's analysis began but did not end with the fact that the tying product was patented; the court then reviewed other facts in the record before determining that the requisite economic power had been shown. *Id.* at 1003. Thus, the presumption of economic power attendant upon patent or copyright protection of the tying product is not conclusive. The trier must also take note of material facts in the record which may rebut that presumption.

In this case, the question whether Data General possesses economic power in the software market by virtue of its copyrights cannot be resolved short of trial. The plaintiffs have not, at this juncture, brought themselves within the factual framework of *Loew's.* Although they have presented facts suggesting that Data General's software is as desirable to computer customers as "Gone With The Wind" was to television stations,[64] they have not shown that the CPUs Data General ties to its software are as undesirable as "Getting Gertie's Garter." [65] In addition, Data General has presented conflicting factual material suggesting that its software is not particularly desirable.[66]

Moreover, Data General makes a strong case in support of its claim that a presumption of economic power is not appropriate in the context of computer software. Affidavits submitted by Data General's experts and third parties state that copyright notices attached to computer software do not prevent others from developing functionally equivalent programs.[67] Such statements are consistent with a recent district court decision that copyright notices on computer software protect the underlying "source program" but do not prevent others from copying the material embodiment of that program, known as the "object program." *Data Cash Systems, Inc. v. JS&A Group, Inc.,* 480 F.Supp. 1063, 203 U.S.P.Q. 735 (N.D.Ill.1979) (BNA); *cf. Synercom Technology, Inc. v. University Computing Co.,* 462 F.Supp. 1003, 1013 (N.D.Tex.1978).

Whether Data General possesses such economic power with respect to its copyrighted software is a mixed question of law and fact. The factual record is presently too inconclusive to permit summary adjudication in favor of either plaintiffs or defendant. The parties must proceed to trial for a determination of whether the copyright notices attached to Data General's software bestow upon it "some advantage not shared by his competitors" in the software market. *Fortner II, supra,* 429 U.S. at 620, 97 S.Ct. at 868.

Plaintiffs advance another ground in support of their argument that legal barriers render Data General's software unique. They rely on the undisputed fact that Data General claims that its software is proprietary and protected by the law of trade secrets.[68] As with respect to copyright protection, the parties dispute whether trade secrets protection has in fact conferred economic power upon Data General.[69] Unlike the copyright issue, it has nev-

---

**64.** Plaintiffs' fact citations II–C(2)(b), tabs 31, 40–42, 44–47.

**65.** *United States v. Loew's, Inc.,* 371 U.S. 38, 48 n. 6, 83 S.Ct. 97, 103 n. 6, 9 L.Ed.2d 11 (1962). The Court refers to the films mentioned in *Loew's* for illustrative purposes, not to suggest that the requisite disparity between the desirability of the tying product and the undesirability of the tied product must be equivalent to the disparity found in *Loew's.*

**66.** Data General's response (d) and (e) to plaintiffs' statement IIC(2)(b)17–20 and affidavits and evidentiary materials cited therein.

**67.** Affidavit of Ernest E. Keet, president of Turnkey Systems, Inc., and affidavit of Arthur J. Levine, attorney specializing in copyright law. See also Data General's response to plaintiffs' fact statements II,C(1)10 and II,D,21 and factual assertions (a)–(c), (f)–(g) accompanying response to statement II,D,21.

**68.** Data General's factual assertions (a) and (b) in response to plaintiffs' fact statement II,C(1)11.

**69.** *Compare* plaintiffs' replies to Data General's fact statements 29–32, 33–38, 42–43, 44, and 50–51 with Data General's factual assertions (c)–(d) and (f) in response to plaintiffs' fact statement II,C(1)11 and affidavits, declarations, and evidentiary materials cited therein.

er been held that trade secrets protection is sufficient to create a presumption of economic power. In light of both *Fortner II* and the inconclusive state of the record in this area, the Court at this time declines the plaintiffs' invitation to extend the *Loew's* rule to encompass the law of trade secrets. Whether Data General has in fact attained economic power attributable to the trade secrets protection of its software is a question for the jury.

In addition to alleged legal barriers, plaintiffs claim that Data General's software is protected by economic barriers rendering it sufficiently unique to satisfy the economic power requirement.

■ In order to adapt Data General's operating systems software to their particular needs, customers must design applications software. It is undisputed that Data General's customers have spent many millions of dollars developing such applications software.[70] Plaintiffs contend that these customers cannot use their Data General-dependent applications software with any other company's operating systems software without incurring high conversion costs.[71] This "lock-in" is said to constitute an economic barrier giving Data General economic power in the market for operating systems software. However, Data General submits conflicting evidentiary materials indicating that plaintiffs or other companies could economically develop operating systems software that would be compatible with applications software initially designed for use with Data General's operating systems software.[72] This raises precisely the type of factual issue which *Fortner I* and *Fortner II* suggest is more appropriately resolved after a through probe of the material facts at trial, rather than by way of

summary judgment. Moreover, the *Fortner* decisions require plaintiffs to establish not only that Data General enjoys the economic advantage of having customers locked into its software, but also that its competitors are somehow prevented from enjoying similar advantages. *Fortner II, supra,* 429 U.S. at 621, 97 S.Ct. at 868; *Fortner I, supra,* 394 U.S. at 505 n. 2, 89 S.Ct. at 1259 n. 2.

■ Plaintiffs contend that Data General's software is protected by a second type of economic barrier giving rise to the requisite uniqueness. This contention is that Data General's software is so much more comprehensive and field proven than other software that customers are deterred from shifting to other companies' products.[73] Plaintiffs present some evidence suggesting that Data General's software is uniquely desirable to some customers, at least in comparison with other software currently available.[74] Yet Data General offers evidence sufficient to dispute plaintiffs' contentions, indicating instead that some plaintiffs' software and third parties' software is at least as desirable as Data General's.[75] This conflicting evidence creates a genuine dispute with respect to facts deemed material under the *Fortner* decisions.

Plaintiffs argue that even if the alleged legal and economic barriers are insufficient individually to establish Data General's economic power in the software market, the combination of the barriers is sufficient. The legal principle underlying that argument is consistent with the repeated emphasis in tie-in cases upon the particular facts in the record. *See, e. g., Fortner II, supra; Fortner I, supra; United States v. Loew's, Inc., supra.* Whether the application of the principle to this case establishes

---

**70.** Data General's response to plaintiffs' fact statement II,C(2)(a)12.

**71.** Plaintiffs' fact statements II,C(2)(a)13–16 and fact citations II–C, tabs 12–21, 23, 25, 28–29.

**72.** Data General's response to plaintiffs' fact statements II,C(2)(a)13–16 and evidentiary materials cited therein, particularly tabs 44–49.

**73.** Plaintiffs' fact statements II,C(2)(b)17–20.

**74.** *See supra* n. 64.

**75.** Data General's factual assertions (a)–(c) and (e) in response to plaintiffs' fact statements II,C(2)(b)17–20 and affidavits, declarations, and evidentiary materials cited therein, particularly evidentiary materials, tabs 77–79, 81, 150 and 152.

the requisite economic power will turn upon the resolution at trial of the material facts presently in dispute.

### 2

With respect to the CPU-memory tie-in, Ampex phrases its economic power argument in terms of the alleged legal and economic uniqueness of Data General's CPUs. However, some of its contentions pertain not to uniqueness, the second of three alternative indicia of economic power, but to the third—the acceptance of the tie-in by an appreciable number of customers. The Court will discuss the two issues separately.

### (a)

■ Data General admits that it claims copyright, trademark, and trade secrets protection for its CPUs.[76] The parties dispute the factual and legal significance of that protection. Ampex claims that the copyright notices and trademarks create a presumption of economic power.[77] Data General submits an affidavit stating that copyrights and trademarks attached to CPUs do not prevent others from creating functionally equivalent products.[78] Plaintiffs proffer conflicting statements made directly by Data General.[79] The Court finds that a genuine dispute exists and that the jury must determine whether Data General's copyrights and trademarks vest it with economic power in the CPU market.

■ The law does not presume that trade secrets protection confers economic power. Nonetheless, Ampex makes an impressive factual showing that Data General actually possesses economic power by virtue of its trade secrets. For example, Ampex submits the deposition statement of Data General's president expressing doubt that anyone could design a Data General-compatible CPU without infringing its claimed trade secrets.[80] In light of the several material facts which remain subject to genuine dispute, and mindful of the Supreme Court's emphasis upon particularized proof of actual economic power, the Court finds that the record with respect to this issue is not sufficiently conclusive to support summary adjudication. The jury will determine whether Data General's claims of trade secrets protection confer upon it economic power in the CPU market.

■ Ampex also claims that economic barriers render Data General's CPUs unique for purposes of establishing economic power. First, Ampex argues that a Data General CPU is the only kind that Data General permits to be used in conjunction with its software.[81] As noted in Section IV,A,1, *supra*, Data General concedes as much.[82] However, the record concerning this issue lacks undisputed facts sufficient to establish the requisite economic power. Ampex apparently seeks to prove a derivative form of uniqueness based on the following assumptions: (1) Data General's software is uniquely desirable insofar as competitors cannot economically offer similar software; (2) in order to use such software, customers must use Data General's CPUs; and (3) Data General's CPUs derive their uniqueness from the requirement that they, and only they, may be used with Data General's unique software. This argument is sound if and only if the uniqueness of

---

**76.** Data General's response to Ampex' fact statements IV,C,13–14.

**77.** As noted in section IV,B,1, *supra*, the law clearly permits (but does not require) a presumption of economic power based on the existence of copyright protection. The Ninth Circuit has also permitted a presumption to be based on trademark protection. *Siegel v. Chicken Delight, Inc., supra* n. 12, 448 F.2d at 50. *But cf. Capital Temporaries, Inc. of Hartford v. Olsten Corp.,* 506 F.2d 658, 663–65 (2d Cir. 1974); *Cash v. Arctic Circle, Inc.,* 85 F.R.D. 618, 1980–1 Trade Cas. ¶ 63,095 (E.D.Wash. 1979) (CCH).

**78.** Levine affidavit, ¶¶ 23–24.

**79.** Data General's pleadings filed in this litigation, quoted at Ampex' fact citations IV–C, tabs 12–14.

**80.** De Castro deposition, quoted at Ampex' reply citations, tab 24.

**81.** Ampex' fact statement IV,C,11(b).

**82.** Data General's factual assertion in response to plaintiffs' fact statement II,A,3.

Data General's software is established, a matter that cannot be resolved on these cross-motions for summary judgment. In short, the question whether Data General's CPUs are derivatively unique will be answered by the jury.

■ Ampex' second argument with respect to economic barriers is that Data General's CPUs possess unique capabilities. They present some supporting statements by third-party customers,[83] but much of their factual support is self-serving "puff" by Data General employees highlighting the positive features of their products.[84] Data General admits that there are differences between its CPUs and others on the market, but correctly states that Ampex' evidence does not, on the present record, prove that Data General enjoys cost advantages not shared by its competitors.[85] In addition, Data General points out that plaintiffs claim to manufacture CPUs that are functionally equivalent to Data General's.[86] The record contains disputed issues of material fact with respect to the alleged uniqueness of Data General's CPUs. The jury must be called upon to determine whether the NOVA CPUs are unique within the meaning of the *Fortner* decisions.

#### (b)

■ Apart from the uniqueness test, economic power may be demonstrated by the acceptance of a tie-in by a significant number of customers. However, this is limited to situations where there are no other explanations for the willingness of buyers to accept the tie-in. *Fortner II, supra,* 429 U.S. at 618 n. 10, 97 S.Ct. at 866 n. 10.

■ Ampex claims that "an appreciable number of purchasers of NOVA CPUs buy defendant's memory boards even though those purchasers do not want, and in some cases do not use, defendant's memory boards."[87] Ampex identifies eight companies that bought unwanted Data General memory boards in order to obtain NOVA CPUs.[88] This evidence may help to support a finding of economic power, but it alone is not sufficient. The disputed factual issues concerning whether an "appreciable number" of customers have accepted the tie-in,[89] and whether there are other explanations for their behavior,[90] must be resolved by the jury before Ampex' claim of economic power is to be proven or disproven.

#### C

In a case as complex and vigorously litigated as is this, the Court is relieved to find at least one issue that may be resolved with relative ease. The third requisite element of a *per se* tying violation is that "a 'not insubstantial' amount of interstate commerce is affected." *Fortner I, supra,* 394 U.S at 499, 89 S.Ct. at 1256, quoting *Northern Pacific Ry. Co. v. United States, supra,* 356 U.S. at 5–6, 78 S.Ct. at 518. "For purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice, * * * the relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of

---

**83.** Deposition of Bruce DaCosta, University of Arizona, quoted at Ampex' fact citations IV–C, tab 5; deposition of David Clinton, president of Custom Systems, Inc., quoted at *id.,* tab 6.

**84.** Ampex' fact citations IV–C, tabs 7–11.

**85.** Data General's comments on Ampex' evidence re fact statement IV,C,12.

**86.** Data General's factual assertion (c) in response to Ampex' fact statement IV,C,11; Data General's factual assertion (d) in response to Ampex' fact statement IV,C,12; (see also Data General's fact statement 131); plaintiffs' fact statements I,B,8(a)–(c).

**87.** Ampex' fact statement IV,C,11(a).

**88.** Ampex' fact citations IV–A, tab 17 (SEDCO, Inc.); fact citations IV–C, tab 1 (Forney Engineering); tab 2 (Amdahl Corp.); tab 3 (Source One, Inc.); fact citations IV–E, tab 1 (Bell & Howell Co.); tab 3 ( Custom Systems, Inc.); tab 32 (Computervision Corp.); reply citations, tab 3 (American Totalisator Systems, Inc.).

**89.** *See* affidavits cited in Data General's comments on Ampex' IV,C,11 evidence, which affidavits raise a genuine dispute concerning whether an "appreciable number" of buyers have unwillingly accepted the tie-in.

**90.** *Ibid.*

this total accounted for by the particular plaintiff who brings suit." *Fortner I, supra,* 394 U.S. at 502, 89 S.Ct. at 1258.

### 1

■ With respect to the software-CPU tie-in, the question is whether Data General's dollar volume of business in tied CPUs is more than *de minimis. Id.* at 501, 89 S.Ct. at 1257. Data General does not dispute plaintiffs' evidence that it sold and shipped approximately 52,700 CPUs between 1970 and 1978, including shipments in 1977 alone that were valued at $254 million.[91] In addition, Data General admits that the number of its CPUs that are currently installed throughout the United States and abroad is "substantial." [92] Data General attempts to create a dispute by claiming that its competitors were not foreclosed by its tie-in from selling their own CPUs.[93] This dispute is not material to the effect on commerce issue because it is premised on a misconstruction of the governing standard. In *Fortner I* and the earlier cases relied on therein, the Supreme Court looked solely at the total volume of the defendant's tied sales. *See, e. g., Fortner I, supra,* 394 U.S. at 502, 89 S.Ct. at 1258. Proof of actual foreclosure has never been required in order to satisfy the effect on commerce test. Although plaintiffs must prove that *they* were in fact foreclosed from selling CPUs in order to satisfy the separate fact of damage test, they need not prove fact of damage to *all* of Data General's competitors in order to prove that a not insubstantial amount of commerce in the CPU market has been affected by the challenged tie-in. Plaintiffs have shown as much as they need show in order to satisfy the commerce test; the Court finds that a not insubstantial amount of commerce in the CPU market has been affected by Data General's software-CPU tie-in.

### 2

■ With respect to the CPU-memory tie, Ampex has shown that a not insubstantial amount of commerce in memory boards has been affected. First, Data General admits that it has sold a substantial number of CPUs,[94] generating a substantial dollar volume of business. Second, it admits that all CPUs sold from its regular price list are packaged together with at least one memory board.[95] On the basis of these undisputed facts, the Court finds that a not insubstantial amount of commerce in the memory board market has been affected by the CPU-memory tie-in.

### D

■ Even if plaintiffs establish all three elements of a *per se* tying violation, they cannot recover damages without also proving actual injury to their businesses or property. 15 U.S.C. § 15; *Gray v. Shell Oil Co., supra,* 469 F.2d at 749; *Siegel v. Chicken Delight, Inc., supra,* 448 F.2d at 52. Proof of injury is a two-fold process. Plaintiffs must first demonstrate the fact of injury, proof of which is closely related to proof of defendant's liability for violating the antitrust statutes. *Knutson v. Daily Review, Inc., supra,* 548 F.2d at 811. If the fact of injury is established, then plaintiffs must submit proof concerning the amount of damage incurred. Only the fact of injury is at issue for purposes of the pending cross-motions for summary judgment.

■ Fact of injury encompasses two aspects. Plaintiffs must show that they have actually been injured and that their injury was of an antitrust nature, causally related to defendant's antitrust violation. With respect to the former, plaintiffs face a low threshold of proof. "[The] burden of proving the fact of damage under § 4 of the

---

**91.** Data General's answer to Fairchild's complaint, quoted at plaintiffs' fact citations II–E, tab 1; Data General's response to plaintiffs' fact statement II,E.

**92.** Data General's comment in response to plaintiffs' fact statement I,A,3(g).

**93.** Data General's factual assertion in response to plaintiffs' fact statement II,E.

**94.** *Supra* n. 92.

**95.** *Supra* n. 55.

Clayton Act is satisfied by * * * proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research Corp.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969). The Court is to apply a relaxed standard in determining whether plaintiffs have surmounted this low threshold. *Knutson v. Daily Review, Inc., supra*, 548 F.2d at 811. With respect to the latter aspect of causation, plaintiffs must prove that the injury they incurred is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). *See also Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 997 (9th Cir. 1979). Here, too, a relaxed standard governs. "It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury." *Zenith Radio Corp. v. Hazeltine Research Corp., supra*, 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9. *See also Knutson v. Daily Review, Inc., supra*, 548 F.2d at 811. If it appears to a "reasonable probability" that defendant's illegality was a material cause of plaintiffs' injury, the causation test is satisfied. *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9th Cir. 1957), *cert. denied*,

355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). The defendant must establish that plaintiff's injury was caused by factors other than his antitrust violation in order to defeat plaintiff's showing. *Knutson v. Daily Review, Inc., supra*, 548 F.2d at 811.

1

■ The record contains undisputed facts indicating that customers who use Data General's software have been deterred from purchasing plaintiffs' CPUs for use with that software.[96] Data General's challenge to plaintiffs' evidence focuses not upon the conceded fact of lost sales (which relates to the actual injury aspect of the damage issue), but upon the reasons therefor (which relate to the causation aspect). Thus, the first aspect of the damage element is readily satisfied.[97]

■ Plaintiffs' evidence of injury also establishes the requisite causation, *i. e.*, that the foregone sales were attributable to the fact that customers using Data General's software felt bound by the tie-in to use Data General's rather than plaintiffs' CPUs.[98] Data General claims that customers chose not to purchase plaintiffs' CPUs for reasons unrelated to the tie-in.[99] For example, Data General's submissions suggest that some plaintiffs do not provide

**96.** Plaintiffs' fact citations IV–E, tab 21 (re Ampex); II–D, tab 3 (re Bytronix); II–D, tab 6 (re Digidyne); II–D, tabs 1, 4. (re Fairchild); plaintiffs' supp. fact citations II–D, tabs 1, 5–6 (re SCI). One plaintiff, Data Compass, does not move for summary judgment on the fact of damage issue. Data Compass' reply brief in support of motion for summary judgment at 2. Consequently, that issue is reserved for trial (or subsequent motion by either party).

**97.** Plaintiffs allege four types of injury in addition to the lost sales. They claim that Data General's copyright and trade secrets claims prevented the development of competing software to which customers could easily convert (fact statement II,D,21), that plaintiffs incurred additional expenditures to develop software for use with their own CPUs and that they would not have developed such software in the absence of the tie-in (fact statement II,D,23), that they incurred legal expenses defending Data General's lawsuits enforcing the illegal tie-in

(fact statement II,D,24), and that they paid higher prices for unwanted tied items purchased from Data General than they would have paid in the absence of the tie-in (fact statement II,D,25). Disputed issues of fact exist with respect to each of these claims. *See* Data General's responses to each of the cited fact statements. However, the undisputed fact of lost sales is sufficient to support a finding of fact of damage under *Zenith Radio Corp. v. Hazeltine Research Corp.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969), and *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977).

**98.** *See* plaintiffs' fact citations listed in *supra* n. 96.

**99.** Data General's factual assertion (e) in response to plaintiffs' fact statement II,D,22.

adequate field service for their CPUs,[100] some of plaintiffs' marketing and pricing policies deter some customers,[101] some customers wonder whether plaintiffs may be forced out of business if Data General prevails in the trade secrets phase of this litigation,[102] and customers could obtain non-Data General software for use with plaintiffs' CPUs.[103] This evidence may go far toward minimizing the amount of damages plaintiffs ultimately recover, but it is insufficient to create a genuine dispute with respect to the fact of plaintiffs' damage. The causation test has been met by plaintiffs' proof that Data General's tie-in was *a* material cause of their injury. Plaintiffs need not prove that it was the sole, or principal, cause. *Zenith Radio Corp. v. Hazeltine Research Corp., supra*, 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9; *Knutson v. Daily Review, Inc., supra*, 548 F.2d at 811. Data General can only blunt the legal effect of plaintiffs' proof by affirmatively establishing that other factors actually caused plaintiffs' injury. Data General's evidence, viewed in the most favorable light, shows that factors other than the tie-in *may* have *contributed* to plaintiffs' injury. It neither negates nor raises a genuine dispute regarding the undisputed fact that the tie-in was a material cause of plaintiffs' injury. Finally, it is clear that the causation problem in *Brunswick* is absent here because plaintiffs' injury flows directly from the restrictive nature of Data General's tie-in and is precisely the type of injury at which the antitrust laws are aimed.

### 2

■ With respect to the CPU-memory tie-in, Ampex submits a solid record of un-disputed facts in support of its fact of damage argument. That argument is that customers who purchased Data General's CPUs were compelled to buy Data General's tied memory boards for use therewith, although they would have preferred to buy Ampex' memory boards.[104]

Ampex' evidence of injury and causation comes from statements by the customers [105] and by an Ampex salesman concerning foregone sales opportunities.[106] Data General admits that Ampex incurred some damage: "Data General concedes that two or three customers of Ampex may have stated that they would have preferred Ampex memories but purchased Data General computers with main memory for various reasons." [107]

Again Data General focuses on the causation aspect. First, Data General claims that Ampex' memory boards are not compatible with Data General's CPUs.[108] In light of the undisputed fact that some customers would have purchased Ampex' memory boards for use with Data General's CPUs, evidence suggesting that the customers might have encountered servicing problems if they had used Ampex' memory boards cannot negate Ampex' showing that the tie-in was *a material cause* of its lost sales. A most generous reading of Data General's evidence fails to raise a genuine dispute with respect to the fact of Ampex' damage. The amount of Ampex' damage is for the jury to determine.

Second, Data General claims that it does not require customers to purchase memory along with its CPUs and any customer could have purchased a Data General CPU

**100.** Data General's evidentiary materials, tabs 12 and 104.

**101.** *Id.*, tabs 12, 107–110.

**102.** *Id.*, tab 106.

**103.** *Id.*, tab 100.

**104.** Ampex' fact statement IV,E,17(f).

**105.** Ampex' fact citations IV–E, tab 1 (re Bell & Howell Co.); tab 2 (re Action Communications Systems, Inc.); tab 3 (re Custom Systems, Inc.); tab 32 (re Computervision Corp.).

**106.** Baumeister deposition, quoted at Ampex' fact citations IV–E, tabs 8–9.

**107.** Data General's response to Ampex' reply affidavits, etc. at 27.

**108.** Data General's factual assertions (a)--(b) in response to Ampex' fact statement IV,E,17.

and an Ampex memory board if desired.[109] This defense fails because undisputed facts in the record establish that (1) Data General does impose a tie-in requirement upon initial purchases of its CPUs,[110] and (2) even though some of the customers on whose testimony Ampex relies have purchased unbundled CPUs from Data General's spare parts list, those customers' initial purchases of Data General's CPUs were from the regular price list and subject to the minimum memory purchase requirement.[111]

### E

As noted in section II,A, *supra,* the *per se* rule against tying arrangements admits of circumscribed exceptions. Some courts have held that legitimate business justifications permit the maintenance of a tie-in scheme which otherwise possesses the requisite elements of *per se* illegality. In recognition of the fact that any tie-in presumably promotes the business interest of the party imposing the restraint, the justifications deemed "legitimate" are few and narrowly construed. *See, e. g., Moore v. Jas. H. Matthews & Co., supra,* 550 F.2d at 1217–18; *Siegel v. Chicken Delight, Inc., supra,* 448 F.2d at 50–52; von Kalinowski, 9 Antitrust Law and Trade Regulation § 64.-05[1] (1979). Even with respect to the few exceptions that have been accepted, an asserted justification will prevail only "in the absence of less restrictive alternatives." *Siegel v. Chicken Delight, Inc., supra,* 448 F.2d at 51. *See also Standard Oil Co. v. United States,* 337 U.S. 293, 306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949); *IBM v. United States,* 298 U.S. 131, 139–40, 56 S.Ct. 701, 705, 80 L.Ed. 1085 (1936).

### 1

Data General asserts three business justifications in support of its software-CPU tie-in. The first is that it is necessary to restrict Data General's software to use with its CPUs in order to protect its good will and minimize service problems. A good-will defense is the one most frequently raised in tie-in cases, as the Supreme Court noted when it set out the governing standards for evaluating such defenses:

> "[The good will justification] fails in the usual situation because specification of the type and quality of the product to be used in connection with the tying device is protection enough. If the manufacturer's brand of the tied product is in fact superior to that of competitors, the buyer will presumably choose it anyway. *The only situation, indeed, in which the protection of good will may necessitate the use of tying clauses is where specifications for a substitute would be so detailed that they could not practically be supplied."* Standard Oil Co. v. United States, supra,* 337 U.S. at 306, 69 S.Ct. at 1058 (emphasis added).

The Ninth Circuit quoted and applied this standard in the course of rejecting an alleged good-will defense in *Moore v. Jas. H. Matthews & Co., supra,* 550 F.2d at 1217. The Ninth Circuit has also suggested in *dicta* that a good-will justification might be accepted where specifications could not be supplied because to do so would divulge trade secrets. *Siegel v. Chicken Delight, Inc., supra,* 448 F.2d at 51.

Data General's good-will defense rests upon two assumptions. First, Data General states that its software and CPUs are designed to function together, it does not know whether foreign CPUs are "totally compatible" with its software, and its software cannot be expected to function as effectively and reliably with foreign CPUs as with Data General's CPUs.[112] Second, it states that it would be prohibitively expensive to provide field service for its software

---

**109.** Data General's response (f) and factual assertions (c)–(d) in response to Ampex' fact statement IV,E,17.

**110.** *See* section IV,B,2, *supra.*

**111.** *See supra* nn. 57–58.

**112.** Brief of Data General in opposition to plaintiffs' motion for partial summary judgment at 54 ("Data General's opposition brief"); *see, generally,* Data General's response to plaintiffs' fact statements I,A,1 and III,C,14–16.

when used with foreign CPUs.[113] The combined result of these factors is that Data General's software would malfunction more frequently and Data General would be less able to service it if it were used with foreign CPUs. Customers would be dissatisfied and Data General's reputation would be tarnished.

Even if the jury were to accept as true each of Data General's evidentiary submissions in support of these assumptions, it would not be permitted to find that the software-CPU tie-in is a justifiable restraint because the record establishes beyond dispute that less restrictive alternatives are available. One potential alternative—providing specifications for foreign CPUs to ensure their compatibility with Data General's software—may not be available insofar as the specifications would disclose Data General's trade secrets.[114] Another alternative—providing lesser warranties when software is licensed on an unbundled basis than when it is licensed for use with a Data General CPU—clearly is available. Data General already offers a sliding scale of warranties with its software. Software in "Category A" is fully serviced, while that in "Category C" is provided "as is." Data General explains that even under the latter warranty, it services the product and charges the customer on a time and materials basis.[115] Data General concedes that it is possible, though costly, to service its software when used in a hybrid system.[116] Such costs could simply be passed along to customers who choose an unbundled, lesser warranty option. Or Data General could decline to provide service for its software when used with foreign CPUs and customers could decide whether to avail themselves of the advantages of Data General's service support or devise a hybrid system and rely on independent service companies. There is no indication that Data General's existing use of lesser warranties has impaired its reputation and there is no factual basis for suspecting that use of limited warranties for unbundled software will have that effect. In addition, Data General's evidentiary submissions establish that at least one of its competitors has already employed a lesser warranty alternative [117] and another has endorsed its practical availability.[118] The gist of Data General's explanation for requiring all software licensees to use Data General's CPUs rather than permitting them the option of using Data General's software with foreign CPUs under a limited warranty is that, in the words of Data General's president, "that is simply not the way we want to do business." [119] Under the governing case law, that is simply not a legitimate justification for restraining competition.

The second of Data General's asserted justifications is that it must bundle its software together with its CPUs in order to recover its substantial investment in software research and development. The argument is that its software investment costs are high, customers expect software to be supplied at little or no cost, and investment costs can only be recovered by folding the sale of CPUs into the licensing of software.[120] Moreover, it would be unfair to permit emulator-CPU manufacturers to reap the benefits of Data General's software R&D when they sell their competing

**113.** Data General's factual assertion (b)(8) in response to plaintiffs' fact statement I,A,1 and responses (c)(5)–(9) in response to plaintiffs' fact statements III,C,14–16.

**114.** Supplemental Gaal affidavit ¶ 5.

**115.** Gaal affidavit ¶¶ 9–10; plaintiffs' fact citations III–D, tabs 1–3.

**116.** De Castro affidavit ¶ 12(k); affidavit of Donnie W. Reed, Data General's manager of product support, ¶ 4.

**117.** Borovoy deposition, quoted at Data General's evidentiary materials, tab 3 (re Intel).

**118.** Sweet deposition, quoted at Data General's evidentiary materials, tab 145 (re Zilog).

**119.** De Castro affidavit ¶ 12(j).

**120.** Data General's responses (b) and (c) to plaintiffs' fact statements III,C,14–16.

CPUs for use with Data General's under-priced software.[121]

■ The law precludes a jury finding in Data General's favor on the basis of this justification. Recovery of investment costs has been explicitly excluded from the narrowly-construed exceptions to the *per se* rule against tie-ins. In *United States v. Jerrold Electronics Corp., supra*, which came as close as any case to accepting this type of defense, the court rejected an argument nearly identical to that made here. Data General's president phrased his company's reason for bundling software with CPUs as follows:

> "In considering * * * the formulation of an overall [software] licensing policy, one of our most crucial concerns was that we needed an effective and feasible method to obtain adequate financial return for the heavy investment we had made and would need to keep making in integrated research, development, upgrading and post-sale support (including program debugging) of operating system software and hardware for our computers and computer systems. * * * [We] believed that if companies like DCC [Digital Computer Controls Co.], without any investment in or offering of operating system software, could sell purported 'emulating' computers for use by customers with NOVA operating system software, this would not only be unfair, but would also seriously jeopardize our ability to assure fair rewards and incentives for investment in software development, detracting from our ability to improve our computer systems. It would also mean that development of proprietary software would have been rendered useless because anyone who could develop an 'emulator' would obtain 'a free ride' on our proprietary software."[122]

The *Jerrold Electronics* court found that argument to be legally insufficient:

> "Jerrold felt that other companies who had not invested time and money into the development of satisfactory head-end equipment sought to take advantage of it by competing with it as to the amplifiers, but relying on Jerrold's head end equipment to make the system successful. Shapp resented these other companies 'picking our brains' and competing for the real source of profit. Jerrold, therefore, felt justified in recovering its substantial investment in the development of superior head end equipment by using it to preserve for itself a share of the more lucrative market for amplifiers. While the court is sympathetic with Jerrold's predicament, it does not feel that it provides sufficient justification for the use of a tying arrangement. If the demand for Jerrold's equipment was so great, it could recover its investment by raising its prices. Admittedly, the return would not be as great, but it provides sufficient protection to serve as a more reasonable and less restrictive alternative to a tying arrangement." *United States v. Jerrold Electronics Corp., supra*, 187 F.Supp. at 560–61 (footnote omitted).

Data General has not shown, nor has it raised a genuine issue of fact with respect to its ability to show at trial, that it is any less capable than was Jerrold Electronics of adopting the less restrictive alternative of restructured prices in order to recoup its investment costs and maintain its incentives for further innovation.

■ Data General's third alleged justification is that the demands of the marketplace compel it to impose this restraint. Customers want to obtain all components of their computer systems from one company so as to hold that company responsible for the proper functioning of the system ("single vendor accountability") and to avoid "finger-pointing problems" that arise when a hybrid system malfunctions. Competitors restrict the use of their software to their own CPUs, employing one scheme or another. The implied conclusion is that, as a result of its customers' preferences and its

---

**121.** Data General's response (b) to plaintiffs' fact statements III,C,14–16; De Castro affidavit ¶¶ 11–12.

**122.** *Id.*, ¶ 12(e) and (g).

competitors' practices, Data General has no choice but to bundle.[123]

This argument is essentially a paraphrased repackaging of the first and second asserted justifications. In light of the governing law and the undisputed facts in the record, it fares no better than the first two arguments. Data General can achieve the legitimate end of responding to the market's demands by employing means less restrictive than a tie-in. The record establishes beyond dispute that Data General could license its software under both bundled and unbundled-lesser warranty options.[124] Customers who desire single vendor accountability could choose the bundled option; those who prefer hybrid systems, and the record establishes that there are such customers,[125] could select the unbundled option. Data General need not pit the dictates of the marketplace against the mandate of the antitrust laws. The two interests can be simultaneously promoted by way of marketing practices less restrictive than tie-ins.

2

▮ Data General realleges its good will and market response justifications in support of the CPU-memory tie-in.[126] Again the Court finds that, even if the jury were to accept Data General's evidentiary support, it would not be permitted to immunize Data General from antitrust liability on the basis of these alleged justifications. Again the record contains undisputed facts establishing that less restrictive alternatives are available.

First, Data General could offer CPUs without main memory under a lesser warranty than that accompanying a CPU-memory package. Insofar as Data General would feel a continuing obligation to provide service for its CPU customers even under the limited warranty arrangement, it could pass along to such customers the higher costs of servicing hybrid, as opposed to single vendor, computer systems. The record is replete with statements establishing that Data General already services hybrid systems, notwithstanding the increased difficulty and expense involved.[127] Insofar as Data General might prefer to test its CPUs with its own memory boards before selling even an unbundled CPU,[128] the increased costs of removing the memory board after performing the requisite tests could also be passed along to those customers who prefer the unbundled option. Data General's senior vice president for worldwide sales marketing has underscored the practicability of this less restrictive alternative:

"Q. Do you know why Data General switched from listing the separate prices in its price list for the CPU and initial memory, to combining it into a single price?

A. If I remember correctly, at that point in time the testing procedures were such that we had to test the product as a system and we had to put the equipment together to be able to test it thoroughly with the diagnostics.

I think that we found it more costly to disassemble the product again. We just

123. *See, generally,* Data General's opposition brief at 58; Data General's responses to plaintiffs' fact statements I,A,1 and III,C,14–16.

124. *See supra* nn. 115–119 and accompanying text.

125. *See* section II,D,1, *supra.*

126. With respect to the good-will justification, *see* Data General's factual assertions (c)–(h) in response to Ampex' fact statement IV,B,9 (see also Data General's fact statements 117–22). With respect to the market response justification, *see* Data General's factual assertion (j) in response to Ampex' fact statement IV,B,9 (see

also Data General's fact statement 124) and Data General's factual assertions in response to Ampex' fact statement IV,B,10 (see also Data General's fact statements 125–128).

127. De Castro affidavit ¶ 12(k); affidavit of William G. Adams, Data General's regional sales manager, ¶¶ 10, 13; Reed affidavit ¶¶ 4–5.

128. Data General's factual assertions (d)–(f) in response to Ampex' fact statement, IV,B,9 (see also Data General's fact statements 118–120, 123).

figured that once we had it together, we might as well sell it that way." [129]

Second, Data General could provide specifications that foreign memory boards would have to meet in order to be used with Data General CPUs. The reason that Data General offers concerning the difficulty with this alternative is legally insufficient. According to Data General's manager of systems integration engineering:

> "If the computer was shipped without main memory, the customer might choose a less than optimal scheme, which would degrade system performance. In such a case the system would never be able to meet benchmark specifications quoted by Data General." [130]

In other words, specifications are asserted to be impracticable because some customers might ignore them. Yet this risk is inherent in any specification system. The Supreme Court has necessarily rejected the notion that this risk amounts to "impracticability," as it repeatedly relies on the alternative of providing specifications in the course of dismissing alleged justifications for tie-ins. See, e. g., *Standard Oil Co. v. United States, supra,* 337 U.S. at 306, 69 S.Ct. at 1058; *International Salt Co. v. United States, supra,* 332 U.S. at 397–98, 68 S.Ct. at 15; *IBM v. United States, supra,* 298 U.S. at 139–40, 56 S.Ct. at 705. Data General makes no showing that other manufacturers could not produce memory boards to comply with Data General's specifications or that Data General could not design appropriate specifications.

Data General's manager of systems integration engineering sums up the company's business justification for the memory tie-in as follows:

> "[T]he main memory is an essential element of a computer. Quality control, performance and reliability are all enhanced by designing, producing and marketing the computer with the main memory installed and tested with the entire

system at the factory. Any other method of doing business would necessarily either compromise quality or entail additional costs." [131]

Yet the record establishes beyond dispute that Data General could maintain its quality standards by providing specifications for foreign memory boards and could address the cost problem either by passing along the higher costs to customers who choose unbundled CPUs, by providing limited warranties with unbundled CPUs, or both. Data General offers no evidence from which a jury would be permitted to find that legitimate business justifications save its CPU-memory tie-in from *per se* illegality.

## V

Accordingly, the Court holds that genuine issues of material fact exist with respect to plaintiffs' claim that Data General has imposed unlawful tie-ins. The cross-motions for summary judgment must be and hereby are DENIED.

Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, the Court finds that the following material facts exist without substantial controversy:

1. Data General's operating systems software and its central processing units are separate products subject to a tie-in imposed by Data General's Program License Agreement.

2. Data General's central processing units and main memory boards are separate products subject to a tie-in imposed by Data General's minimum memory purchase requirement.

3. Data General's software-CPU tie-in affects a not insubstantial amount of commerce in the CPU market.

4. Data General's CPU-memory tie-in affects a not insubstantial amount of commerce in the memory market.

---

129. Deposition of Herbert J. Richman, quoted at Data General's evidentiary materials, tab A–16,3.

130. Affidavit of Howard V. Taylor, Data General's manager of systems integration engineering, ¶ 4.

131. *Id.,* ¶ 8.

5. All plaintiffs except Data Compass have suffered actual injury of which a material cause was Data General's software-CPU tie-in.

6. Plaintiff Ampex has suffered actual injury of which a material cause was Data General's CPU-memory tie-in.

7. There are no legitimate business justifications for either the software-CPU tie-in or the CPU-memory tie-in because less restrictive alternatives are available.

The Court also finds that the following material facts are actually and in good faith controverted:

1. Whether Data General possesses sufficient economic power in the operating systems software market appreciably to restrain competition in the CPU market;

2. Whether Data General possesses sufficient economic power in the CPU market appreciably to restrain competition in the memory market; and

3. Whether Data Compass has been injured in fact by Data General's tie-in practices.

The parties must proceed to a jury trial to resolve the disputed facts and to determine the amount of damages to which plaintiffs may be entitled. Counsel are to meet and chart the course of additional pretrial proceedings, including (1) identification of issues to which proof at trial will be limited, (2) stipulations of fact, if possible, and (3) discovery to be conducted in preparation for trial. A status conference with the Court will be held on Friday, March 21, 1980, at 9:00 a. m.